IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

CREDIT SUISSE SECURITIES (USA) LLC,

                    Petitioner,

          v.

GUY S. WALTMAN,

                    Respondent.

No. 06 Civ. 3841

---

## PETITIONER'S MEMORANDUM OF LAW
## IN SUPPORT OF PETITION FOR INJUNCTION IN AID OF ARBITRATION

Kevin S. Reed
Alexander C.B. Barnard
William B. Adams
QUINN EMANUEL URQUHART
 OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849-7000

Attorneys for Credit Suisse Securities
 (USA) LLC

Petitioner Credit Suisse Securities (USA) LLC ("Credit Suisse") respectfully submits this memorandum of law in support of its petition for injunctive relief in aid of an arbitration proceeding that Credit Suisse has commenced against respondent, Guy S. Waltman, in accordance with the parties' arbitration agreement.

## Preliminary Statement

Respondent Guy S. Waltman ("Respondent") is a Managing Director in the New York, New York office of Credit Suisse's Private Banking USA business ("Private Banking"). Private Banking is in the business of providing investment brokerage services to high-net-worth individuals and institutions. Respondent, while employed within Private Banking at Credit Suisse, serviced approximately 200 Private Banking accounts containing well over $300 million in assets. On an annualized basis, these accounts presently generate in excess of $2.5 million in revenues for Credit Suisse. Credit Suisse trusted Respondent to maintain its relationships with those clients for the benefit of the firm. In return, Credit Suisse provided Respondent with all of the resources he needed to do that, and Credit Suisse compensated him handsomely.

On May 19, 2006, Respondent and his sales assistant, Christina Rice, abruptly submitted their resignations and indicated that they had accepted employment with UBS Financial Services Inc. ("UBS"). UBS is one of Credit Suisse's direct competitors, and Respondent will be employed there in precisely the same capacity as he was at Credit Suisse. Respondent – undoubtedly, by design – resigned suddenly and without affording Credit Suisse an opportunity to transition the clients for which he served as a primary contact to other Credit Suisse employees. Credit Suisse thus finds itself at a significant and unfair disadvantage in trying to keep those clients.

In addition, before resigning, Respondent solicited at least two Credit Suisse employees to join him at UBS. One of them, Ms. Rice, resigned effective immediately, also on

May 19, 2006. Moreover, on information and belief, since his purported resignation, and perhaps even before, Respondent solicited Credit Suisse clients to move their business to his new employer, UBS. Finally, in the weeks leading up to his departure from Credit Suisse, Respondent stole from Credit Suisse a voluminous amount of sensitive confidential and trade secret-protected information concerning Credit Suisse client accounts, and proprietary business models and plans. The only conceivable reason for taking this information would be that Respondent intends to use and disclose it at UBS, to the detriment of Credit Suisse and its high net worth clients.

In exchange for a handsome compensation package and other benefits, and to preserve Credit Suisse's ability to reasonably compete with Respondent for business in the event of his departure from the firm, on multiple occasions, Respondent entered into a contract with Credit Suisse where he agreed that he would (i) provide Credit Suisse with at least 90 days' notice before terminating his employment; and (ii) wait at least 60 days after the termination of his Credit Suisse employment before soliciting any of Credit Suisse's employees or clients. Respondent also agreed that he would not retain or otherwise misuse Credit Suisse's confidential or proprietary information. Credit Suisse paid for those commitments from Respondent to ensure that, in the event Respondent left the firm, Credit Suisse would have a fair opportunity to retain the clients the firm entrusted to him. By resigning without notice and immediately joining UBS, Respondent has blatantly violated his promises and deprived Credit Suisse of the benefit of the parties' bargain.

Credit Suisse intends to seek redress for Respondent's misconduct, but pursuant to another agreement between the parties, Credit Suisse will not do so here but before an arbitrator. Respondent, during the course of his Credit Suisse employment, agreed to abide by

Credit Suisse's Employment Dispute Resolution Program (the "EDRP"), which mandates that all employment related disputes be arbitrated before one of three specified arbitration services, subject to a preliminary obligation to attempt to mediate the dispute. The EDRP requires that any such arbitration (including any preliminary mediation) be conducted in the New York metropolitan area. In accordance with EDRP requirements, on May 19, 2006, Credit Suisse served mediation and arbitration demands upon Respondent. If the mediation fails, Credit Suisse will proceed to arbitration against him. Credit Suisse's claims against Respondent are for: (1) breach of contract; (2) breach of fiduciary duty; and (3) misappropriation of confidential information and trade secrets.

To preserve the efficacy of any eventual arbitration, Credit Suisse requests that this Court preliminarily enjoin Respondent from commencing work for UBS, directly or indirectly contacting any Credit Suisse clients, or otherwise breaching his obligations to Credit Suisse. Credit Suisse further requests that this Court order Respondent to return to Credit Suisse all confidential and/or trade secret material that he took from Credit Suisse at any time, including any such information stored on his blackberry e-mail device. Absent the issuance of such relief, Respondent will be free to use Credit Suisse's trade secret information for his and UBS's benefit, in an effort to poach Credit Suisse's clients during the pendency of the arbitration, and Credit Suisse will face irreparable harm as a result. If that were to happen, any arbitration award ultimately issued in Credit Suisse's favor will be a pyrrhic victory, because the damage will be complete and permanent.

## FACTUAL SUMMARY

### The Parties

Credit Suisse is, and at all relevant times has been, one of the world's leading financial institutions. Credit Suisse is engaged in the business of selling investment products and

providing financial services to its clients. Declaration of Matthew W. Gorman ("Gorman Decl.")

¶ 3. Respondent is employed as a Managing Director in the New York, New York office of

Credit Suisse's Private Banking USA business. *Id.* ¶ 4.

## Respondent Gains Access to Credit Suisse's Client Relationships and Information and Agrees To Covenants Designed to Secure Them

Private Banking at Credit Suisse manages the investment assets of high-net-worth

individuals. Respondent joined Private Banking on or about January 16, 1995. While employed

at Private Banking, Respondent was responsible for approximately 200 Private Banking accounts

containing in excess of $300 million in assets under Credit Suisse management. Gorman Decl.

¶¶ 4, 8.

During his employment with Credit Suisse, Waltman agreed to be bound by and

follow all of Credit Suisse's employment-related policies, including those set forth in the Credit

Suisse US Employees Handbook. Respondent most recently indicated his agreement to be

bound by Credit Suisse's policies on October 14, 2005, when he electronically signed a

certification to that effect. Gorman Decl. ¶ 17 & Exh. C.

The Credit Suisse US Employees Handbook requires, as amended on January 1,

2005, all Credit Suisse employees at the level of Managing Director to provide at least 90 days'

notice before terminating their employment (the "Notice Provision"). Gorman Decl. ¶ 15 & Exh.

B. The Handbook also obligates Credit Suisse to provide all covered employees, including

Waltman, thirty-days' notice before terminating their employment for any reason other than for

cause. *Id.* Additionally, the Handbook contains the following non-solicitation policy (the "Non-

Solicit Provision"):

> For 60 days after the termination of their employment, Managing
> Directors are prohibited from:

"(A) directly or indirectly soliciting, inducing or encouraging any employee of [Credit Suisse] and its parents and affiliates (the "Group"), or any consultant or independent contractor providing services to the Group, to leave the Group or to join or perform services for any other company; or

(B) directly or indirectly soliciting, inducing or encouraging any entity or person who is a customer or client of the Group to cease to engage the services of the Group in order to use the services of any entity or person that competes directly with a material business of the Group, where the identity of such customer or client, or the customer or client's need or desire for or receptiveness to services of a type offered by the Group, is known by you as a result of your employment with the Group."

*Id.*

   In addition to his October 2005 agreement to comply with all Credit Suisse employment policies, Respondent specifically agreed to abide by the Notice Provision and the Non-Solicit Provision: In response to a February 2005 e-mail from Credit Suisse CEO Brady Dougan, Respondent electronically certified that he would provide ninety days' notice before terminating his employment and that he would refrain from direct or indirect solicitation of Credit Suisse clients and employees for an additional 60 days after his termination. Gorman Decl. ¶ 18 & Exh. D.

   The Notice Provision and the Non-Solicit Provision to which Waltman agreed are necessitated by the nature of the Private Banking business. The lifeblood of that business is the relationships that Private Banking has with its clients. Employees like Respondent are entrusted with and paid to maintain those relationships. To permit them to do that, Credit Suisse provides Private Banking employees with office facilities, computer equipment, secretarial services, sales assistants, operational systems, use of departmental experts and services, inventory, and the benefit of Credit Suisse promotional marketing and sales support. Credit Suisse also provides Private Banking employees with confidential market research. Gorman Decl. ¶¶ 9, 11, 12.

In addition, Credit Suisse allows its Private Banking employees access to information about firm clients, including their names, contact information, investment profiles, investment returns, risk tolerances and liquidity. Such information is highly proprietary and confidential, because it would enable a competitor to gain an "inside track" on soliciting the clients away from Credit Suisse. Credit Suisse policy provides that employees may never use Credit Suisse's confidential information for the benefit of any other party. However, recognizing that it cannot expect its employees to forget client-related information when they resign and go elsewhere, Credit Suisse also requires employees to agree (contractually or through company policies) to reasonable and limited notice and noncompete/nonsolicit covenants designed to ensure Credit Suisse a fair opportunity to preserve its client relationships when an employee who has serviced them leaves the firm. The covenants at issue here provide a 150-day window (90 days' notice of termination, followed by 60 days of non-solicitation) during which Respondent cannot interfere with Credit Suisse's client and employee relationships, allowing Credit Suisse an opportunity to retain client accounts and valuable employees. Relatedly, the notice covenant also ensures Credit Suisse an opportunity to realign broker teams or find and train replacements for Respondent so as not to diminish the level of service Credit Suisse offers its clients. Gorman Decl. ¶¶ 14-15.

**Respondent Abruptly Resigns and Commences Employment with Direct Competitor UBS, Soliciting Credit Suisse Employees and Clients and Misappropriating Confidential Information**

On May 19, 2006, Respondent and his sales assistant, Christina Rice, submitted letters of resignation to Credit Suisse in which they purported to resign immediately. Gorman Decl. ¶¶ 21, 23. The timing and circumstances surrounding Rice's resignation make plain that Respondent solicited Rice to join him at UBS. *Id.* ¶ 37. Prior to his purported resignation,

Respondent also unsuccessfully solicited Bruce Theuerkauf, another Credit Suisse employee, to join UBS, going so far as to give a UBS representative's business card to Mr. Theurekauf, and to follow up repeatedly with Mr. Theuerkauf to see if he had contacted UBS, as Respondent had recommended he do. *Id.* ¶¶ 35-36. Respondent has thus already violated his Non-Solicit Provision.

In addition, it appears that Respondent has informed Credit Suisse clients of his departure from Credit Suisse and employment with UBS, and he has, on information and belief, solicited business from such clients for UBS. Over the past several months, Respondent has been making a significant number of trips to visit Private Banking clients. Indeed, after one such trip, for which he sought reimbursement from Credit Suisse, Waltman received an e-mail from a client's daughter suggesting that Waltman had told the client that Waltman planned to leave Credit Suisse. Gorman Decl. ¶ 38.

Moreover, Credit Suisse has recently learned that Respondent has been using his Credit Suisse e-mail account to send Credit Suisse's confidential and proprietary information to his personal e-mail account and, on information and belief, to his son, James Waltman. Gorman Decl. ¶ 27-34. Here are but a few examples:

- On May 15, 2006, Respondent e-mailed to his private e-mail account Credit Suisse's model portfolio, which is a highly confidential and proprietary document revealing the precise percentages that Credit Suisse Asset Management allocates to various securities investments in its customer accounts.

- On May 15 and May 16, 2006 Respondent e-mailed confidential reports to himself and his son that contained monthly and historical statements,

account values, recent gains or losses, and the allocation of investments for Credit Suisse's clients' life insurance trusts, as well as for Credit Suisse's "Split Dollar Program," which is an insurance arrangement for the senior-most executives of Credit Suisse. The information in each of these reports, which includes highly confidential life insurance arrangements, is especially sensitive to both Credit Suisse and its high net worth clients.

- Because of his employment at Credit Suisse, Respondent has sat on the Board of Directors of Winthrop Trust Company, which Credit Suisse owns, and he has held various positions in the Trust, including Chief Investment Officer. As a result of his employment with Credit Suisse and work with the Trust, Respondent has had access to significant amounts of confidential information about Credit Suisse's clients, including their discretionary payments from the Trust. On May 15, 2006, Respondent e-mailed confidential information about the Trust, including requests for discretionary payments, to his personal e-mail account.

- Respondent has also e-mailed to himself a PowerPoint presentation that he and Mr. Theuerkauf used to make a business presentation "pitch" to a prospective Credit Suisse client. This presentation contains confidential information from the prospective client that was entrusted to Credit Suisse, as well as Credit Suisse's investment advice and strategy.

- Respondent has also repeatedly e-mailed to himself and his son contact information for Credit Suisse clients. Since Respondent's employment

8

with UBS is in direct competition with Credit Suisse, these client lists can be used to solicit Credit Suisse's clients.

Based on the foregoing, it is evident that Respondent has blatantly violated the Notice Provision, the Non-Solicit Provision, and his obligations not to misuse Credit Suisse's confidential and proprietary information. In light of Respondent's purported resignation on May 19, 2006, Credit Suisse sent him a letter that same day reminding him of his obligations to the firm. Gorman Decl. ¶ 24 & Exh. G. Respondent, however, has given no indication that he intends to comply with his contractual commitments, in particular the Notice Provision and the Non-Solicit Provision.

## The Parties' Arbitration Agreement

Since 1998, Credit Suisse has had an Employment Dispute Resolution Program (or, "EDRP") that is applicable to all of its United States-based employees. By its express terms, the EDRP is the exclusive means for resolving any and all "Employment-Related Claims" that arise between an employee and Credit Suisse. Gorman Decl. ¶ 41. "Employment-Related Claims" are broadly defined in the EDRP to include "[a]ll present and future claims against [Credit Suisse] by an employee, and all present and future claims against an employee by [Credit Suisse]" that "relate to or arise from the employee's application for employment, employment, or termination (including manner of termination) of employment, or from events occurring after termination but relating to one of the foregoing, and . . . assert the violation or infringement of a legally protected right." Id. ¶ 42.

The EDRP provides that Employment-Related Claims shall be resolved through a three-step process. The first step requires the aggrieved party to file an internal grievance. If the grievance is not resolved, the party may initiate non-binding mediation with Credit Suisse before

a mediator supplied by JAMS. If mediation is not successful, the employee or Credit Suisse can initiate arbitration before one of only three arbitration providers: the American Arbitration Association, the CPR Institute for Dispute Resolution, or JAMS.[1]  Absent a mutual agreement to arbitrate elsewhere, arbitration under the EDRP must take place in the New York metropolitan area, and the arbitrator must apply New York law. Gorman Decl. ¶ 43.

All United States-based Credit Suisse employees are required as a condition of employment to agree to abide by the EDRP. Gorman Decl. ¶ 44. Respondent did so expressly as part of his certification of compliance with Credit Suisse policies and procedures, expressly including the EDRP, on October 14, 2005. *Id.* ¶ 17 & Exh. C.

On or about May 19, 2006, in the wake of Respondent's blatant solicitation of Credit Suisse, and improper resignation and affiliation with UBS, and unlawful taking of Credit Suisse's confidential and proprietary information, Credit Suisse served Respondent with requests for mediation and arbitration pursuant to the EDRP. Gorman Decl. ¶ 47 & Exhs. K-L. In the event the mediation fails – and Respondent's behavior suggests that failure is a virtual certainty – Credit Suisse will pursue arbitration against Respondent pursuant to the EDRP. The claims Credit Suisse will assert in that arbitration, including claims for breach of contract, breach of fiduciary duty, and misappropriation of confidential information and trade secrets, will constitute Employment-Related Claims under the EDRP, as they will all "relate to or arise from the employee's application for employment, employment, or termination (including manner of

---

[1]     In *Credit Suisse First Boston Corp. v. Pitofsky*, 4 N.Y.3d 149, 82 N.E.2d 929 (2005), the New York Court of Appeals held that two Credit Suisse registered representatives were not bound by the provision of the EDRP limiting arbitration to these forums but could, instead, proceed before the New York Stock Exchange. Two Courts in this District have held otherwise. *See CSFB v. Padilla*, 326 F. Supp. 2d 508, 513 (S.D.N.Y. 2004); *CSFB v. Groves*, 333 F. Supp. 2d 229, 232 (S.D.N.Y. 2004). The split of authority does not matter, however, because regardless of which arbitration provider is used, Respondent is (i) bound by the EDRP and by his Form U-4 to arbitrate this dispute, and (ii) pursuant to the EDRP, arbitration must take place in New York.

termination) of employment, or from events occurring after termination but relating to one of the foregoing . . . "

Based on past experience, it will take a number of days to schedule and hold a mediation. Then, there will be an additional period of time before the arbitration is held. In the meantime, Respondent will have control over the sensitive trade secret information that he stole from Credit Suisse, and he can be counted on to use that information in an effort to destroy Credit Suisse's valuable relationships with its clients in his new employment with UBS. If Respondent is not enjoined from doing so, any eventual arbitration relief that Credit Suisse obtains will be rendered moot, because the irreparable harm to Credit Suisse's business will have been completed. Moreover, given Respondent's solicitation of Mr. Theuerkauf and Ms. Rice to join him at UBS, it is especially important that Respondent not be able to indirectly violate his obligations to UBS by directing Ms. Rice or others to do so. Gorman Decl. ¶ 49.

## Argument

### THE COURT SHOULD GRANT CREDIT SUISSE PRELIMINARY INJUNCTIVE RELIEF PENDING THE ARBITRATION OF THIS DISPUTE

#### A.    The Court is Empowered to Issue Injunctions in Aid of Arbitration

The Federal Arbitration Act allows and, indeed, "*requires* courts to enforce privately negotiated agreements to arbitrate . . . in accordance with their terms . . ." Volt Info. Scis., Inc. v. Leland Stanford, Jr. Univ., 489 U.S. 468, 478 (1989) (emphasis added); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed" (emphasis in original)). The Second Circuit has long recognized that an adjunct of the power to compel arbitration is a power to issue preliminary injunctive relief to maintain the viability of arbitration. "Arbitration can become a 'hollow formality' if parties are able to alter

irreversibly the status quo before the arbitrators are able to render a decision in the dispute."
Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1053 (2d Cir. 1990).
Courts, therefore, have the ability "to preserve the meaningfulness of the arbitration through a
preliminary injunction." Id. "The issuance of an injunction to preserve the status quo pending
arbitration fulfills the court's obligation under the FAA to enforce a valid agreement to
arbitrate." Id. at 1054.

Indeed, the court in Blumenthal specifically upheld the lower court's authority to
enter a preliminary injunction in circumstances exactly like those before the Court here. In
Blumenthal, former Merill Lynch brokers left the firm, taking with them confidential Merrill
Lynch "customer lists and other records used to service clients." Id. at 1050. After the brokers
commenced an arbitration, Merrill Lynch sought "a preliminary injunction prohibiting [the
brokers] from soliciting or accepting orders from their pre-existing [Merrill Lynch] clients." Id.
In response, the district court "preliminarily enjoined [the brokers] from using Merrill Lynch
customer records or soliciting or accepting business from any Merrill Lynch client" pending the
resolution of the arbitration. Id. The Second Circuit firmly rejected the brokers' argument that
the district court lacked authority to issue the preliminary injunction, noting that prior Second
Circuit precedent "gave explicit and broad recognition to a district court's power to grant
preliminary injunctive relief pending arbitration." Id. at 1052. Accordingly, it is beyond
question that the Court has the authority to grant the preliminary injunctive relief sought by
Credit Suisse here.

The standard for issuance of a preliminary injunction in aid of arbitration is the
same as for issuance of a preliminary injunction generally. Id. at 1054. The moving party must
demonstrate: "(1) the likelihood of irreparable harm in the absence of such an injunction, and (2)

either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in its favor." State of New York ex rel. Spitzer v. Cain, 418 F. Supp. 2d 457, 472 (S.D.N.Y. 2006) (Cote, J.) (citing Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005)).

## B.  Credit Suisse Is Likely to Succeed on the Merits of Its Claims

As set forth above, Credit Suisse will assert claims in arbitration under New York law[2] against Respondent for breach of contract, breach of fiduciary duty, misappropriation of trade secrets and possibly others. Given Respondent's conduct, Credit Suisse is at the very least likely to prevail on some or all of these claims and to obtain relief requiring Respondent to return Credit Suisse's property and cease his improper behavior. Accordingly, the latter prong of the test for preliminary injunctions is satisfied here.

### 1.  Credit Suisse Will Prevail On Its Breach Of Contract Claim

To establish a claim for breach of contract, Credit Suisse must prove: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by the other; and (4) damages resulting from the breach. See K. Bell & Assocs. v. Lloyd's Underwriters, 827 F. Supp. 985, 988 (S.D.N.Y. 1993). Credit Suisse easily satisfies these elements.

The conduct described in the Declaration of Matthew W. Gorman undoubtedly establishes a claim for breach of contract. In fact, Respondent has bound himself two times over to the Notice Provision and the Non-Solicit Provision that he has so blatantly violated. First, in response to an e-mail from Credit Suisse's CEO, informing all Managing Directors of an

---
[2]  As mentioned above, the EDRP requires that its mediation and subsequent arbitration proceedings take place in New York, under New York law.

amendment to the Credit Suisse US Employees Handbook whereby all Managing Directors would be required to provide ninety days' notice before terminating their employment and to refrain from soliciting Credit Suisse clients and employees for sixty days after their effective termination, Respondent electronically certified that he would comply with these provisions. Mr. Dougan's e-mail to each Managing Director explained that "[Y]ou are required to certify that you are familiar with [the notice and non-solicit provisions], that you understand them and that you agree to comply fully with them. . . You do this by clicking the button at the bottom of the form. . . . This will act as your signature and will also reflect your understanding of these new policies and agreement to be bound by them." Gorman Decl. ¶ 18 & Exh. D. Respondent affirmatively electronically certified his agreement, and, of course, such electronic signatures are valid and binding. *See* 15 U.S.C. § 7001(a) (2006) ("Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II of this chapter), with respect to any transaction in or affecting interstate or foreign commerce -- (1) a signature, contract or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and (2) a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation").

Second, on October 14, 2005, Respondent electronically certified that he would comply with Credit Suisse's employment policies, which include the Notice Provision and the Non-Solicit Provision. Gorman Decl. ¶ 17 & Exh. C. Again, by affirmatively checking the box on the electronic form that corresponded to the statement that he would abide by Credit Suisse's employment policies, Respondent formally assented to Credit Suisse's proposed terms of his employment. In exchange for Respondent's agreement to abide by the Notice Provision and

Non-Solicit Provision, in addition to other Credit Suisse employment policies, Credit Suisse agreed, among other things, to provide him with (i) continued at-will employment with substantial compensation, (ii) thirty days' notice prior to terminating his employment for any reason other than cause, and (iii) his base salary through the end of the notice provision. Gorman Decl. ¶ 19. These benefits that Credit Suisse conferred on Respondent in exchange for his commitment to abide by the Notice Provision and Non-Solicit Provision constitute sufficient consideration. See, e.g., Credit Suisse First Boston Corp. v. Pitofsky, 4 N.Y.3d 149, 155, 824 N.E.2d 929, 932 (2005) (stating that "continued, lucrative employment by CSFB [now Credit Suisse]" constituted "valuable consideration" for employees' acceptance of a new arbitration provision); Gazzola-Kraenzlin v. Westchester Medical Group, P.C., 10 A.D.3d 700, 702, 782 N.Y.S.2d 115, 117 (2d Dep't 2004) (holding that "plaintiff's continued employment by the defendant . . . constituted good and sufficient consideration for the restrictive covenants, notwithstanding the at-will nature of the employment relationship").

Respondent has egregiously violated the Notice Provision by purporting in his May 19, 2006 letter to resign effectively immediately and commencing employment with UBS. Gorman Decl. ¶ 19 & Exh. E.

In further breaches of contract, Respondent while still employed with Credit Suisse, solicited Credit Suisse employees Ms. Rice and Mr. Theuerkauf to leave the firm with him and join him at UBS. As mentioned, Rice resigned the same day as Respondent, indicating that she would be working with Respondent at UBS, and that she had been given certain incentives to do so. Gorman Decl. ¶¶ 23, 37 & Exh. F.

In addition, Respondent, on information and belief, has already begun soliciting clients. Indeed, one client indicated to Credit Suisse that Waltman sent an e-mail to the client

asking it to quickly transfer its account to UBS in advance of the hearing in this matter set for May 22, 2006. Gorman Decl. ¶ 39. Respondent almost certainly used Credit Suisse's client lists to solicit Credit Suisse clients to take their business to UBS well in advance of his resignation, and he can be counted on to continue to solicit Credit Suisse's clients in the future. As noted, Respondent had a substantial number of client meetings over the past several weeks, and Credit Suisse has recently discovered that he has been e-mailing the contact information for Credit Suisse's clients to his personal e-mail account. *Id.* ¶¶ 27-34, 38. He will almost certainly attempt to use those client lists and other Credit Suisse trade secrets to obtain an unfair advantage over Credit Suisse.

New York law enforces restrictive covenants such as those contained in the Credit Suisse US Employees Handbook. More than twenty years ago, New York's highest court recognized that "the modern trend in the case law seems to be in favor of according such [restrictive] covenants *full effect* when they are not unduly burdensome . . . ." Mohawk Maint. Co. v. Kessler, 52 N.Y.2d 276, 284 (1981) (emphasis added). Under the modern rule, New York courts "have repeatedly enjoined employees from breaching [restrictive covenants] when they are reasonable in scope, duration and geographical area." Maltby v. Harlow Meyer Savage, Inc., 166 Misc. 2d 481, 485 (Sup. Ct. N.Y. Co. 1995). Where geographic and temporal concerns are satisfied, New York courts enforce restrictive covenants to the extent necessary to protect an employer's legitimate business interest, including the preservation of client relationships. See BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 394 (1999).

There can be no question that the covenants at issue here -- a ninety-day notice provision followed by sixty-days of non-solicitation, are temporally reasonable. As noted above, this brief period will afford Credit Suisse an opportunity to shore up its relationships with the

clients formerly handled by Respondent without Respondent's interference. See Ticor Title Ins. Co. v. Cohen, No. 98 Civ. 4001, 1998 WL 355420 at *3, 4 (S.D.N.Y. July 2, 1998), aff'd, 173 F.3d 63 (2d Cir. 1999) (employer is entitled to "an even playing field" against former employee in competition for clients); Maltby, 166 Misc. 2d 481 (N.Y. Sup. 1995) (same). Respondent, on the other hand, will be only minimally inconvenienced by this period, especially considering that Credit Suisse will continue to pay his base salary during the notice period. See Maltby, 166 Misc. 2d at 486 ("a trader's absence from trading for six months does not render him unemployable within the industry or substantially impair his ability to earn a living."); Ticor, 1998 WL 355420 at *3 ("it defies common sense that clients [Respondent] had developed over numerous years would forget him in six months"); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 470 (S.D.N.Y. 2001) (ordering energy commodities broker to refrain from competing with former employer, and noting that "it is unlikely that the long-term relationships [the broker] successfully cultivated before and after his time at [plaintiff] would dissipate in this time."). New York courts have consistently upheld post-employment restrictions of the same or longer duration. See, e.g., Webcraft Technologies, Inc. v. McCaw, 674 F. Supp. 1039, 1045-46 (S.D.N.Y. 1987) (where employee stole trade secrets, including customer lists, enforcement of "broad worldwide covenant not to compete or solicit customers for a period of two years" was enforceable); Bus. Intelligence Servs., Inc. v. Hudson, 580 F. Supp. 1068, 1074 (S.D.N.Y. 1984) (twelve-month non-competition agreement enforced nationwide).

As for geographical scope, the restrictive covenants are no broader than necessary to protect Credit Suisse. The covenants impose no geographical limit because modern technology permits none. Respondent could service Credit Suisse's Private Banking clients from any place with a phone line and an Internet connection. Indeed, as Judge Leisure held in

enforcing a nationwide non-compete: "the inter-dealer broker business in which [Respondent] is engaged is done over the phone lines and . . . [Respondent] could conduct his business from anywhere in the world where there is a telephone . . . Therefore, a geographic restriction on the covenants would render them nullities." Natsource, 151 F. Supp. 2d at 471.

Finally, the covenants at issue here are necessary to protect Credit Suisse's legitimate business interests. For one thing, Credit Suisse has a "legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." BDO Seidman, 93 N.Y.2d at 392. "An employer has sufficient interest in retaining present customers to support an employee [non-compete] covenant where the employee's relationship with the customers is such that there is a substantial risk that the employee may be able to divert all or part of the business." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 72 (2d Cir. 1999) (internal quotation marks omitted). "[T]he risk to the employer reaches a maximum in situations in which the employee [has worked] closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction." BDO Seidman, 93 N.Y.2d at 391-92 (internal quotation marks omitted); see also Maltby, 166 Misc. 2d at 486 (Brokers "have unique relationships with the customers with whom they have been dealing that have been developed while employed at [employer] and, partially, at [employer's] expense.") To alleviate that risk, an employer is entitled to a period of exclusive access to its customers, in order to secure an "an even playing field" on which to compete against the former employee. Ticor, 1998 WL 355420, at * 4.[3]

---

[3]    In Maltby, the Court enforced a non-compete covenant on the grounds of unique abilities of an employee. 166 Misc. 2d at 486; see also Natsource, 151 F.Supp.2d at 465 (client relationships make defendant unique).

Credit Suisse also has a legitimate interest in preventing the disclosure of the trade secret information that Respondent misappropriated, in addition to other confidential customer-related information given to Respondent in the course of his Credit Suisse employment. See Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 308 (1976). A trade secret is defined to include "any . . . compilation of information which is used in one's business and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." Unisource Worldwide, Inc. v. Valenti, 196 F. Supp. 2d 269, 278 (E.D.N.Y. 2002) (applying New York law; internal citations omitted). New York law thus supports the enforcement of a restrictive covenant through an injunction to protect "confidential customer information." Reed, Roberts Assocs., 40 N.Y.2d at 308; Unisource Worldwide, Inc., 196 F. Supp. 2d at 279 (confidential customer lists held to be protected trade secrets).

Accordingly, Credit Suisse's restrictive covenants constitute an enforceable part of the parties' contractual commitments. As Respondent cannot deny, Credit Suisse met its obligations to Respondent. Indeed, Respondent has been paid significant compensation for agreeing to these limited restrictive covenants. Respondent, by contrast, breached his commitments by: (1) going to work for Credit Suisse's competitor, UBS, without providing the required notice; (2) soliciting Credit Suisse employees and clients to leave the firm; and (3) stealing sensitive confidential trade secret information. Thus, Credit Suisse will prevail on its claim for breach of contract.

## 2.    Credit Suisse Will Prevail On Its Breach Of Fiduciary Duty Claims

In addition to the contractual duties he owed to Credit Suisse, Respondent owed common law obligations to Credit Suisse.[4] As a Private Banking Managing Director,

---

[4]    Under New York law, as in other jurisdictions, employees owe a fiduciary duty to their employers. See CBS Corp. v. Dumsday, 268 A.D.2d 350, 353 (1st Dep't 2000) ("it is axiomatic that an employee is 'prohibited

Respondent held a position of trust with Credit Suisse. His job responsibilities included the development and management of investment accounts for Credit Suisse's customers and clients. In the performance of those job duties, he was privy to confidential customer information, including the names, addresses, and telephone numbers of Credit Suisse's clients, as well as the clients' trading information, investment preferences, and risk tolerances. He was also privy to crucial confidential trade secret information. Gorman Decl. ¶ 13.

It is a firmly established principle "in the law of this State that an employee 'is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" DoubleClick, Inc. v. Henderson, No. 116914/97, 1997 WL 731413 at *6 (Sup. Ct. N.Y. Co. Nov. 7, 1997) (citation omitted).

Here, it is obvious that Respondent violated his fiduciary duties to Credit Suisse. First, he impermissibly solicited at least two Credit Suisse employees to leave Credit Suisse and go to work for Credit Suisse's competitor, UBS. Second, he solicited at least one (and probably numerous) Credit Suisse Private Banking clients to move its business to UBS. Moreover, Respondent misappropriated highly-sensitive confidential trade secret information concerning Credit Suisse's clients and strategy. Under New York law, these actions constitute a clear violation of Respondent's fiduciary duty to Credit Suisse. See DoubleClick, Inc., 1997 WL 731413 at *6 (In misappropriating employer's trade secrets and by secretly using his "'principal's time, facilities [and] proprietary secrets to build the competing business,'" defendant breached his fiduciary duty) (citation omitted).

---

from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" (citation omitted)); Kaufman v. IBM, 97 A.D.2d 925, 927 (3d Dep't 1983) (employee "had both a contractual and a fiduciary duty not to disclose any [of former employer's] confidential information ... for his own purposes.").

3.    **Credit Suisse Will Prevail On Its Claims For Misappropriation of Confidential and Proprietary Information or Trade Secrets**

To prevail on a claim for misappropriation of confidential and proprietary

information or trade secrets, New York law requires that a plaintiff demonstrate that it possessed

a trade secret, and that the defendant used the trade secret in breach of an agreement *or* a

confidential relationship or duty, *or* as a result of discovery by wrongful means. North Atl.

Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999). A trade secret is any "'formula,

pattern, device, or compilation of information which is used in one's business, and which gives

him an opportunity to obtain an advantage over competitors who do not know or use it.'"

DoubleClick, Inc., 1997 WL 731413, at *4 (quoting Restatement of Torts § 757 cmt. b). Credit

Suisse's confidential and proprietary information concerning its clients, including their identities,

key contact persons, fee structures, investment preferences and strategies; financial data relating

to the performance of Private Banking; and any other competitive information gained at Credit

Suisse's expense, constitute protectable trade secrets. North Atl. Instruments, Inc., 188 F.3d at

44 (plaintiff's "client list, which contains the identities and preferences of its client contacts,

constitutes a protectable trade secret."). See also Ticor, 1998 WL 355420, at *4 (defendant's

"knowledge of pending transactions . . . would clearly give him and [his new employer] an unfair

advantage in wresting these deals away from Ticor"). Respondent, like all Credit Suisse

employees, has a fiduciary duty not to utilize such information for the benefit of anyone other

than Credit Suisse. As detailed above, however, he has already begun to violate that duty by,

among other things, repeatedly e-mailing to his personal account highly confidential and

proprietary information that Credit Suisse and its clients did not intend to leave the Firm.

Gorman Decl. ¶¶ 27-34. Accordingly, Credit Suisse will prevail on its claim against Respondent

for misappropriation of trade secrets.

## D.    Credit Suisse Will Suffer Irreparable Harm Absent Injunctive Relief

The one remaining prong of the test for injunctive relief—irreparable harm—is
likewise satisfied here. Credit Suisse seeks preliminary injunctive relief in order to prevent
Respondent from permanently damaging Credit Suisse's business interests pending the
resolution of the arbitration that Credit Suisse commenced against Respondent. In the absence of
the requested injunctive relief, the very harm that Credit Suisse seeks to address via the
arbitration will occur before a decision can be rendered. Thus, the parties' arbitration will be
effectively rendered moot, unless the status quo is preserved. The loss of Credit Suisse's right to
meaningfully resolve disputes via arbitration constitutes irreparable harm.

Respondent's wrongful violation of the Notice Provision and his solicitation of
Credit Suisse's employees and at least one client, which has already succeeded in inducing one
Credit Suisse employee to leave the firm, itself also threatens to cause irreparable harm to Credit
Suisse. In addition, Respondent's conduct has caused, and will continue to cause, irreparable
harm and damage to Credit Suisse's business and goodwill for which there is no adequate
remedy at law. Respondent's wrongful acts threaten to seriously compromise years of
substantial investment by Credit Suisse in its confidential, proprietary and trade secret
information—as well as the goodwill and relationships cultivated with its customers. Credit
Suisse's relations with its clients are critical to its continued success. Credit Suisse now faces
the potential destruction of both Credit Suisse's clients' goodwill—which Credit Suisse has spent
millions of dollars to develop—and the vast and critical potential referral of additional business.

Credit Suisse's loss of goodwill and customer relations cannot be compensated by
money damages, nor could the loss of its confidential information and trade secrets. Injunctive
relief is appropriate here, because there is simply no way to know the amount of future revenue

that Credit Suisse will lose if Respondent is permitted to continue to violate his contractual and

common law duties.  Courts in this Circuit have routinely recognized that such losses are not

compensable in money alone, and as such, constitute irreparable harm:

> Loss of good will constitutes irreparable harm which cannot be
> compensated by money damages.  The use and disclosure of an
> employer's confidential customer information and the possibility
> of loss of customers through such usage constitute irreparable
> harm.

Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) (citations omitted); see also

Danielson v. Local 275, 479 F.2d 1033, 1035 (2d Cir. 1973) ("Irreparable injury is suffered

where monetary damages are difficult to ascertain or are inadequate.").

        Numerous courts have recognized that injunctive relief is appropriate to prevent

such irreparable losses.  See e.g., North Atl. Instruments, Inc., 188 F.3d at 49 (employer

established that former employee's theft of customer list would result in irreparable harm, and

court affirmed grant of preliminary injunction); FMC Corp. v. Taiwan Tainan Giant Indus. Co.,

730 F.2d 61, 63 (2d Cir. 1984) (injunctive relief was appropriate to protect trade secrets,

including plaintiff's client lists, and court noted that the loss of a trade secret constitutes

irreparable harm because "[a] trade secret once lost is, of course, lost forever."); Alert Holdings,

Inc. v. Interstate Protective Servs., Inc., 148 B.R. 194, 201 (S.D.N.Y. 1992) (showing of

"substantial losses from the defendants' actions as well as injury to its reputation, goodwill and

customer relations" entitled Petitioner to preliminary injunctive relief); Euro Brokers Capital

Mkts., Inc. v. Flinn, No. 93 Civ. 3785, 1993 WL 213026, at *1 (S.D.N.Y. June 16, 1993) ("The

loss of an employer's confidential customer information cannot be compensated by money

damages" – temporary restraining order granted); Ecolab Inc., 753 F. Supp. at 1110 (enjoining

former employees from: (1) retaining Ecolab's trade secret information concerning its client's

pricing and preferences; and (2) competing with Ecolab).

### Conclusion

For the foregoing reasons, Credit Suisse's petition for an injunction in aid of

arbitration should be granted.

Dated: New York, New York
       May 22, 2006

                                    QUINN EMANUEL URQUHART OLIVER
                                    & HEDGES, LLP

                                    By:  _____
                                         Kevin S. Reed (KR-5386)
                                         Alexander C.B. Barnard (AB-3181)
                                         William B. Adams (WA-0621)

                                    51 Madison Ave., 22nd Floor
                                    New York, New York  10010
                                    Tel.: (212) 849-8100

                                    Attorneys for Credit Suisse Securities (USA) LLC