UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

CREDIT SUISSE SECURITIES (USA) LLC,     :     No. 06 Civ. 3841
                        Petitioner,

      -against-

GUY S. WALTMAN
                        Respondent.

-------------------------------------------------------- x

### DECLARATION OF MATTHEW W. GORMAN IN SUPPORT OF PETITIONER'S PETITION FOR INJUNCTION IN AID OF ARBITRATION

MATTHEW W. GORMAN declares:

1. I am employed in New York, New York as a Managing Director and Regional Office Manager of the Private Banking USA business at Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC, "Credit Suisse" or "Petitioner"). I have been in the financial services industry for approximately twenty years, most recently with Credit Suisse and, prior to that, with Donaldson, Lufkin & Jenrette. As a Regional Office Manager of Credit Suisse, my duties include supervising the account executives – such as Respondent Guy S. Waltman ("Waltman") – who work at 11 Madison Avenue, New York, New York, and ensuring that they conduct themselves in accordance with Credit Suisse policies.

2. I make this declaration in support of Petitioner's application for an injunction in aid of arbitration in the above-captioned action against Respondent. I have personal knowledge of the facts set forth herein except where stated to be on information and belief, in which case, I believe those facts to be true.

3. Credit Suisse is, and at all relevant times has been, one of the world's leading financial institutions and a limited liability company duly organized and existing under the laws

GL590/1887885.5

of the State of Delaware, with its principal place of business at 11 Madison Avenue, New York, New York. Credit Suisse is engaged in the business of selling investment products and providing financial services to its clients. Credit Suisse is a NASD member company.

4. Waltman is a Managing Director employed in the New York, New York office of Credit Suisse's Private Banking USA business ("Private Banking"), and he resides in New Hope, Pennsylvania. Waltman is registered with the NASD as a broker employed by Credit Suisse, and, on information and belief, he has been employed with Credit Suisse for over ten years.

5. On May 19, 2006, Waltman abruptly purported to resign and accept employment with one of Credit Suisse's competitors in blatant violation a contract that requires him (a) to provide ninety days' notice before terminating his employment, and (b) to refrain from soliciting any of Credit Suisse's clients or employees for sixty days following the termination of his employment.

6. Of at least equal concern, prior to his purported resignation, Waltman e-mailed confidential and sensitive information belonging to Credit Suisse to his private e-mail account, in violation of a Credit Suisse confidentiality agreement expressly forbidding such action and his common law fiduciary obligations to Credit Suisse.

**Waltman's Role as a Trusted Credit Suisse Private Banking Executive**

7. Private Banking provides investment advisory and portfolio management services for clients throughout the United States and the world. The client base for Private Banking is necessarily limited and includes high net worth individuals and smaller institutions, such as hedge funds, foundations and endowments. The nature of Private Banking's business requires the exercise of discretion to manage substantial investment portfolios. Thus, the trust and

confidence of its clients are crucial to Private Banking's business. Indeed, client relationships are the lifeblood of the Private Banking business.

8. While employed in Private Banking, Waltman and his team were responsible for over 200 Private Banking accounts containing well over $300 million in assets under management. On an annualized basis, these accounts presently generate in excess of $2.5 million in revenue for Credit Suisse.

9. Respondent was also very highly-compensated by Credit Suisse, earning well in excess of $500,000 per year.

10. I am aware that the vast majority of the Credit Suisse client relationships serviced by Waltman were developed by Credit Suisse without Waltman's assistance, and placed into Waltman's care as a trusted Private Banking employee. Likewise, the vast majority of Private Banking client assets that Waltman managed were developed by Credit Suisse independent of Waltman's efforts.

**Credit Suisse's Support of Waltman and His Access to Sensitive Information**

11. Waltman was able to develop and/or maintain his relationships with the clients he serviced on Credit Suisse's behalf due to support provided by Credit Suisse. Credit Suisse provided Waltman with ongoing training and paid for and sponsored his registration with the NASD. Credit Suisse also provided Waltman with office facilities, computer equipment, secretarial services, sales assistants, research, operational systems, use of departmental experts and services, inventory, and the benefit of Credit Suisse promotional marketing and sales support. Credit Suisse's support of Waltman allowed him to grow the Credit Suisse client assets under his management and, consequently, the compensation he received.

12. Credit Suisse also paid Waltman's associated expenses and reimbursed him for travel and entertainment expenses associated with business development. Waltman incurred sizeable expenses that Credit Suisse reimbursed, including nearly $55,000 for expenses he reported during the period from December 29, 2004 to March 21, 2006. A spreadsheet reflecting Waltman's expenses during this period is annexed hereto as Exhibit A. In addition, Waltman submitted significant expenses for reimbursement by Credit Suisse in the past several weeks leading up to his departure.

13. By virtue of his work for Private Banking, Waltman was privy to a vast amount of information concerning the clients he serviced, including the names, addresses, and telephone numbers of those clients, as well as the clients' investment profiles, investment returns, risk tolerances and liquidity. Such information is highly proprietary and confidential because it would provide a competitor of Credit Suisse with a pronounced advantage in attempting to obtain business from the clients at Credit Suisse's expense.

14. Credit Suisse maintains company policies advising employees of their obligations to safeguard the company's assets and confidential and proprietary information, both during employment and following departure from Credit Suisse. To further maintain the confidentiality of such information, Credit Suisse protects its physical offices by electronic security systems as well as conventional locks. It safeguards its electronic data and information by means of electronic security measures. Access to account information and other financial information about a specific customer is limited to the registered representatives responsible for managing that customer's investment accounts. Access to electronic data and information is by individual password only. No employees of Credit Suisse are authorized to keep or maintain personal

records concerning customers or to take any other customer information with them when they resign from employment.

**Waltman's Contractual Obligations to Credit Suisse**

15. The Credit Suisse US Employees Handbook (the "Handbook"), as amended on January 1, 2005, requires all Credit Suisse employees at the level of Managing Director to provide at least ninety days' notice before terminating their employment ("Notice Provision"). The Handbook also obligates Credit Suisse to provide all covered employees, including Waltman, thirty-days' notice before terminating their employment for any reason other than for cause.[1] Additionally, the Handbook contains a non-solicitation policy ("Non-Solicit Provision") under which for 60 days after the effective termination of their employment, Managing Directors are prohibited from:

> (A) directly or indirectly soliciting, inducing or encouraging any employee of [Credit Suisse] and its parents and affiliates (the "Group"), or any consultant or independent contractor providing services to the Group, to leave the Group or to join or perform services for any other company; or
>
> (B) directly or indirectly soliciting, inducing or encouraging any entity or person who is a customer or client of the Group to cease to engage the services of the Group in order to use the services of any entity or person that competes directly with a material business of the Group, where the identity of such customer or client, or the customer or client's need or desire for or receptiveness to services of a type offered by the Group, is known by you as a result of your employment with the Group.

Waltman is employed as a Managing Director. A true and correct copy of pertinent excerpts from the Handbook is annexed hereto as Exhibit B.

---

[1] Credit Suisse is entitled to reduce the amount of notice it gives to a covered employee that it terminates other than for cause, but in any case, must generally pay base salary to the employee for the thirty-day period following notice of termination to the employee.

16. The Handbook also states, with regard to confidential information, "Employees are prohibited from using any of [Credit Suisse's] confidential and proprietary information for any purpose and from disclosing such information to any person after they leave [Credit Suisse]."

17. During his employment with Credit Suisse, Waltman, on at least two occasions, agreed to be bound by and follow all of Credit Suisse's employment-related policies, including those set forth in the Handbook. Waltman most recently indicated his agreement to be bound by Credit Suisse's policies on October 14, 2005, when he electronically signed a certification to that effect. Copies of two of Waltman's electronic certifications are annexed hereto as Exhibit C.

18. One of Waltman's electronic certifications was made in response to a February 21, 2005 e-mail from Credit Suisse CEO, Brady Dougan, to all Credit Suisse Managing Directors, including Waltman, which set forth the terms of the Notice and Non-Solicit Provisions. Mr. Dougan's e-mail to each Managing Director, including Waltman, states, in part, "[Y]ou are required to certify that you are familiar with [the Notice and Non-Solicit Provisions], that you understand them and that you agree to comply fully with them. . . . You do this by clicking the button at the bottom of the form. . . . This will act as your signature and will also reflect your understanding of these new policies and agreement to be bound by them." (emphasis added). A true and correct copy of Mr. Dougan's February 21, 2005 e-mail is annexed hereto as Exhibit D. It was thus made very clear to Managing Directors, like Waltman, who received this e-mail that when they executed their electronic certifications agreeing to be bound by Credit Suisse's policies and the Handbook, as Waltman did, they were specifically "signing" (i.e., executing) and agreeing to adhere to the Notice and Non-Solicit Provisions.

19. To sum up, Waltman was twice bound by a contract to provide 90 days' notice of his intention to resign, under the terms of the Notice Provision, and, for an additional 60 days, to refrain from directly or indirectly soliciting Credit Suisse's clients and employees, as set forth in the Non-Solicit Provision. Waltman received significant consideration for these commitments, in that, in exchange: (1) he was permitted to remain in Credit Suisse's employ; (2) Credit Suisse agreed to provide Waltman with 30 days' notice of its intention to terminate him other than for cause, or to pay him the base compensation that he would have earned in 30 days, in the event Credit Suisse decided not to provide 30 days' notice; and (3) in the event he resigned, Waltman was entitled to remain on the Credit Suisse payroll and to receive his base salary during his 90-day Notice period.

**Waltman's Abrupt Resignation and Breaches of His Fiduciary and Contractual Obligations to Credit Suisse**

20. At approximately the end of March or early April 2006, Waltman told me that he was considering leaving Credit Suisse for UBS Financial Services Inc. ("UBS"), a direct competitor of Credit Suisse's Private Banking business. He also informed me that UBS had been recruiting him. However, at that time, Waltman did not indicate that he had decided to accept a position at UBS, or to resign, and he did not provide notice of an intent to resign.

21. It was not until May 19, 2006, that Waltman delivered a letter of resignation to Credit Suisse, which he purported to make effective immediately. A true and copy of Waltman's letter of resignation is annexed hereto as Exhibit E.

22. On information and belief, the day he purported to resign, May 19, 2006, Waltman told Barbara Ridge of Private Banking that he did not intend to comply with the terms of the Notice Provision or the Non-Solicit Provision, and instead he intended to begin competing with Credit Suisse within a few short hours that very day.

23. Also on May 19, 2006, Christina Rice, a sales assistant who worked with Waltman, delivered a letter of resignation to Credit Suisse, which she purported to make effective immediately. A true and correct copy of Rice's letter of resignation is annexed hereto as Exhibit F.

24. On May 19, 2006, Credit Suisse sent Waltman a letter reminding him that he is obligated to abide by the Notice Provision and the Non-Solicit Provision and that he is not permitted to disclose or cause to be disclosed any of Credit Suisse's confidential or proprietary information. A true and correct copy of Credit Suisse's May 19, 2006 letter to Waltman is annexed hereto as Exhibit G.

25. On information and belief, prior to his purported resignation on May 19, 2006, Waltman had numerous discussions with UBS concerning the possibility of him leaving Credit Suisse to go to work for UBS.

26. UBS is in the same business as Credit Suisse, providing retail brokerage services to clients and, in particular, high-net-worth clients. UBS is a direct competitor of Credit Suisse.

**Waltman Misappropriates Confidential and Trade Secret Information from Credit Suisse**

27. Based on Waltman's departure from Credit Suisse, the Firm has engaged in an investigation of his conduct in leaving. This investigation has turned up extremely disturbing evidence that, over the past several weeks (and even months), Waltman has used his Credit Suisse e-mail account to e-mail confidential and sensitive information belonging to Credit Suisse to his personal e-mail account. On May 15, 2006, for example, Waltman e-mailed to his personal account current information about a Credit Suisse model portfolio, which is a highly confidential and proprietary document revealing the precise percentages that Credit Suisse Asset Management allocates to various securities investments in its customer accounts. More

specifically, the portfolio that Waltman e-mailed to his personal account not only identifies the securities in which Credit Suisse recommends investing, but also reflects the recommended amount, by percentage, of each investment. This information would allow a competitor to know the current precise investment mix of a client's account, which would assist the competitor immeasurably in competing for the client's business.

28. In addition, on May 15 and May 16, 2006, Waltman used his Credit Suisse e-mail account to e-mail extremely sensitive and confidential insurance reports for Credit Suisse clients, including among such clients, *top current and former senior management of Credit Suisse*, to his personal e-mail account. These February and April 2006 reports include, in intimate detail, the monthly and historical statements, account values, recent gains or losses, and the allocation of investments for Credit Suisse's clients' life insurance trusts, as well as for Credit Suisse's "Split Dollar Program," which is a special investment program containing life insurance-related aspects for the most senior current and former executives of Credit Suisse. Additionally, on May 16, 2006, Waltman sent the April 2006 reports listed above to a non-Credit Suisse e-mail account listed as "Jamie@Work." Upon information and belief, the "Jamie@Work" e-mail account is the UBS e-mail address of Waltman's son, Jamie Waltman, who is presently employed by UBS. As UBS is a direct competitor of Credit Suisse, I am greatly concerned that Waltman has placed this highly confidential and sensitive information of our senior executives in the hands of the competitor and with the intent of soliciting the business of these trust accounts. I am not aware of any legitimate purpose that Waltman could have to take these materials and jeopardize the confidentiality of these important accounts.

29. The information contained in each of the e-mails that Waltman misappropriated by sending them to his personal account includes highly confidential information about Credit

Suisse's clients' accounts and life insurance arrangements and is proprietary to Credit Suisse. In addition, the clients whose accounts are described in these documents have an interest in keeping their financial information confidential.

30. Over the past several months, Waltman has also used his Credit Suisse e-mail account to e-mail the contact information for Credit Suisse clients to his personal e-mail account. Credit Suisse's client lists, and particularly the contact information for its clients, are confidential and proprietary information.

31. Waltman also e-mailed to his personal e-mail account a PowerPoint presentation that he and Bruce Theuerkauf, another Private Banking registered representative, recently used in a business presentation "pitch" to a prospective Private Banking client. This presentation contains confidential information from the prospective client that was entrusted to Credit Suisse concerning the prospective client's holdings, as well as Credit Suisse's investment advice and strategy. As such, this information was never intended to leave Credit Suisse.

32. By virtue of his employment at Credit Suisse, Waltman sat on the Board of Directors and held various positions, including Chief Investment Officer, of a major trust company ("Winthrop"), which is a trustee for various accounts and owned by Credit Suisse. As a result of his employment with Credit Suisse and work with Winthrop, Waltman has had access to significant amounts of confidential information about accounts belonging to *top former key senior executives of Credit Suisse* for which Winthrop acts as trustee. Such confidential information includes, but is not limited to, the monthly activity of each account, which includes net assets, distributions, etc. On May 15, 2006, Waltman e-mailed confidential information about the Trust, including Winthrop's board meeting minutes and documentation of specific

requests by beneficiaries for discretionary payments, to his personal e-mail account. This information would be useful to a competitor in attempting to obtain business from these clients.

33.    In addition, on May 21, 2006, I learned that, upon departing Credit Suisse, Waltman took his blackberry e-mail device with him, and failed to submit it to Credit Suisse. This blackberry device permits Waltman to send and receive e-mail using his Credit Suisse account. All bills associated with the use of his blackberry are reimbursed by Credit Suisse. Importantly, Waltman's blackberry is capable of storing hundreds of e-mail messages, and all contact information of Credit Suisse Private Banking clients. All e-mail sent or received using his Credit Suisse e-mail account, and much (if not all of any additional data typically stored on blackberry devices, such as client information) is proprietary to Credit Suisse. Moreover, much of the information that is typically stored on blackberries, including but not limited to e-mail and client contact lists, is confidential, trade secret information.

34.    All of the information that Waltman absconded with as described above is proprietary and confidential to, and constitutes trade secrets belonging to, Credit Suisse, and much of it is confidential to its clients as well. If Waltman is permitted to retain this information, or, worse, use it at his new employer, Credit Suisse's and its clients' sensitive information will continue to remain unprotected, and will more than likely be misused. Indeed, it is inconceivable that Waltman would have taken the information if he did not intend to use it. On May 21, 2006, counsel for Credit Suisse sent an e-mail to Waltman's counsel demanding the return of all of the confidential and trade secret information that Waltman took from Credit Suisse, including any such information that may be stored on his blackberry device. Later that day, May 21, 2006, counsel for Waltman responded and did not agree to return the information that Waltman took

from Credit Suisse. True and correct copies of this e-mail correspondence is collectively annexed hereto as Exhibit H.

**Waltman Solicits Credit Suisse Employees and Clients**

35. Furthermore, on information and belief, Waltman solicited at least two Credit Suisse employees to leave the firm to go to UBS. For example, on information and belief, beginning in or about the middle of April 2006, Waltman has repeatedly approached a Credit Suisse employee, Bruce Theuerkauf, with whom he worked as a partner at Credit Suisse, to encourage him to go work for UBS with him. On information and belief, as part of his efforts to recruit Mr. Theurkauf to go to UBS, Waltman provided Mr. Theuerkauf with the business card of Louis G. Poulin, a Managing Director of UBS, and several times followed up, including as recently as May 9, 2006, to ask Mr. Theuerkauf if he had contacted UBS as Waltman had advised him to. A true and correct copy of Mr. Poulin's business card that Waltman gave to Mr. Theuerkauf is annexed hereto as Exhibit I.

36. On information and belief, in an effort to convince Mr. Theuerkauf to join UBS, Waltman told Mr. Theuerkauf that he thought that UBS's business platform was superior to that of Credit Suisse. I consider the above-described recruitment efforts to be a violation of the Non-Solicit Provision.

37. In addition, on information and belief, when Ms. Rice tendered her resignation letter to Barbara Ridge of Private Banking, as mentioned above, she informed Ms. Ridge that Waltman, and his son, James Waltman, had offered her "incentives" to go to work with them at their new employer, which I understand is UBS. On information and belief, one such "incentive" involved increasing her salary by approximately $15,000. Waltman thus appears to have solicited Ms. Rice in violation of the Non-Solicit Provision.

38.     Waltman has also made several trips over the past three weeks, at Credit Suisse's expense. While I cannot be sure of the purpose for such trips, I now suspect that at least some of the recent trips were made for purposes of convincing clients to move their business to UBS, especially because the trips occurred after Waltman informed me that he was considering possibly going to work for UBS, and he did go to work for them soon after the trips occurred. After one of these recent trips, Waltman received an e-mail from the daughter of a client he had visited on the trip, stating, "My Dad informed me of your upcoming changes." This e-mail, and particularly the reference to "upcoming changes," strongly suggests that Waltman, while traveling as a Credit Suisse employee and at Credit Suisse's expense, was soliciting the clients he served for Credit Suisse to move with him to UBS.

39.     Moreover, on information and belief, during the weekend following Waltman's purported resignation on Friday, May 19, 2006, a Credit Suisse Private Banking client communicated to Bruce Theuerkauf that he had received an e-mail from Waltman asking the client to quickly review and act upon attached documentation that appeared to be related to transferring accounts. On information and belief, this e-mail indicated that expedited action was necessary because Credit Suisse had commenced the instant litigation seeking to stop Waltman from violating his obligations to the firm.

40.     By e-mailing Credit Suisse's confidential and sensitive information to his personal e-mail account, soliciting Credit Suisse's clients and employees to leave the firm, resigning without notice, and accepting employment with UBS, Waltman violated internal Credit Suisse policies that he agreed to follow as an express condition of his employment. The Notice and Non-Solicit Provision, as well as the confidentiality provisions, that Waltman agreed to are

reasonable and narrowly tailored to protect Credit Suisse's legitimate business interest in retaining its clients.

**Waltman's Arbitration Agreement**

41.  Since 1998, Credit Suisse has maintained an Employment Dispute Resolution Program (the "EDRP"), a copy which is annexed hereto as Exhibit J. By its express terms, the EDRP is the exclusive means for resolving any and all "Employment-Related Claims" that arise between Credit Suisse and its employees and former employees.

42.  "Employment-Related Claims" are defined in the EDRP to include "[a]ll present and future claims against [Credit Suisse] by an employee" that "relate to or arise from the employee's application for employment, employment, or termination (including manner of termination) of employment, or from events occurring after termination but relating to one of the foregoing, and . . . assert the violation or infringement of a legally protected right."

43.  The EDRP provides that Employment-Related Claims shall be resolved through a three-step process. The first step requires the aggrieved party to file an internal grievance. If the grievance is not resolved, the party may initiate non-binding mediation before a mediator supplied by JAMS. If mediation is not successful, the employee or Credit Suisse may initiate arbitration before one of three arbitration providers: the American Arbitration Association, the CPR Institute for Dispute Resolution, or JAMS. Absent a mutual agreement to arbitrate elsewhere, arbitration under the EDRP must take place in the New York metropolitan area, and the arbitrator must apply New York law.

44.  All United States-based Credit Suisse employees are required as a condition of employment to agree to abide by the EDRP. Additionally, the certifications which Waltman

executed (see Exhibit C) includes a statement that Waltman agreed to abide by any applicable employment dispute resolution program.

45. Credit Suisse's claims against Waltman for violating the Notice and Non-Solicit Provisions and the confidentiality provisions are within the scope of the EDRP as they arise from Waltman's employment with Credit Suisse and the termination thereof. Credit Suisse's claims are thus arbitrable under the EDRP.

46. Even if Credit Suisse's claims were not within the coverage of the EDRP, they would nonetheless be arbitrable under the NASD's Code of Arbitration Procedure, which provides that claims or disputes between or among NASD members and associated persons arising in connection with the employment or termination of employment of an associated person by a member shall be submitted to arbitration.

47. On May 19, 2006, in compliance with the EDRP, Credit Suisse served requests for mediation and arbitration upon Waltman to seek resolution of certain claims arising out of his resignation from Credit Suisse and his subsequent conduct. A true and correct copy of the request for mediation is annexed hereto as Exhibit K. A true and correct copy of the request for arbitration is annexed hereto as Exhibit L.

48. Based on past experience, it will take a number of days to schedule and hold a mediation. Then, there will be an additional period of time before the arbitration is held. If Respondent is permitted to work for UBS during that time, Credit Suisse will suffer further substantial irreparable harm from Respondent's direct or indirect solicitation of Credit Suisse's clients and/or employees and from Respondent's misappropriation of Credit Suisse's confidential and proprietary client-related information. Credit Suisse stands to lose client relationships and goodwill that it has spent years and substantial resources to grow.

48. There is no adequate monetary remedy for such harm.

Dated: New York, New York
May 22, 2006

_____
Matthew W. Gorman

GL590/1887885.3